5. In this case the court determined, that where a translation of any foreign language into English was offered in evidence, it must be a literal, and not a liberal translation; and if there were any ambiguous expressions, or phrases of equivocal meaning inserted in the writing, that there should be a translation made of the various meaning of such expressions, and phrases; and that the best way of ascertaining the meaning of the writer was by considering the precedent and subsequent words, and adopting that sense of the expressions which accorded with the meaning of the writer.

*Martin*, (Attorney General,) and *Shaaff*, for the plaintiff, *Mason* and *Winchester*, for the defendant.

VERDICT and *judgment* for the plaintiff.

The defendant appealed to the Court of Appeals, and the judgment of the General Court was affirmed on both bills of exceptions at November term, 1802.

May 1799.

Hoffman.
vs.
Boisneuf.

## COURT OF APPEALS, JUNE TERM, 1799.

### TUBMAN vs. ANDERSON.

APPEAL from a decree of the court of chancery, *dismissing the bill* of complaint of the appellant. The bill states, that *Edward Anderson*, (the appellee,) in the year 1782, purchased two lots of land of the state of *Maryland*, part of *Calverton Manor*, in Charles county, which had been confiscated. That in the same year the appellee contracted to sell the same to *Alexander Trueman*, for 3l. 15s. 0d. per acre, who accordingly gave bond to the appellee for the purchase money, viz. 750l. and he gave his bond to *Trueman* to convey the land to him in fee on the 23d of September 1785, and accordingly he was put into possession by the appellee, and in that year *Trueman* had paid all the purchase money but a small part. That the appellant in 1785 bought the land from *Trueman*, and bonds were mutually passed for the conveyance of the land to the appellant, and the payment of the money to *Trueman*, which has been paid except a small part. The bill further states, that the appellee, alleging that it would simplify the business by making the conveyance in the first instance *directly* to the appellant, prevailed on the appellant to take an assignment of the appellee's bond of conveyance to *Trueman*, and give up to *Trueman* the bond he had passed to the appellant. That the appellee agreed to take from the appellant the balance he owed to *Trueman*, and to look to *Trueman* for the residue, and promised to convey the premises directly to the appel-

lant. That the balance the appellant owed to *Trueman* was 3504 pounds of tobacco, and 68*l.* 2*s.* 11*d.* current money, which was not to be paid until the appellee made a conveyance—that the appellant has demanded a conveyance, and tendered the money and tobacco. The bill is for a specific performance of the appellee's contract as stated, and for general relief.

The *answer* admits the contract with the state of *Maryland* for the two lots of land distinguished by lots No. 12 and 13, and that the purchase money was paid, as far as was required, until the quantity of land was ascertained. That the appellee sold the lots to *Alexander Trueman* for 3*l.* 15*s.* 0*d.* per acre, for every acre that was contained in the lots when surveyed by the state. That the lots have been surveyed and laid off for 243 acres, and a certificate returned. Denies that the land was sold for 750*l.* or any other sum in gross. Admits that the appellee executed a bond for the conveyance of the land as stated, dated the 23d of September 1782, and took *Trueman's* bond for the payment of 3*l.* 15*s.* 0*d.* per acre, payable in three annual instalments, with interest. That *Trueman,* on the 20th of February 1784, paid 632*l.* 10*s.* 0*d.* in land, and 50*l.* 15*s.* 1*d.* in money, paid by *William Richardson,* which are the only payments made on account of *Trueman's* bond. That in 1785 the appellant informed the appellee that he had purchased the lots from *Trueman,* and showed the appellee the instrument in which the appellant, and *Trueman,* were mutually bound, the appellant to pay 600*l.* with liberty to discharge in tobacco at 38*s.* 9*d.* and *Trueman* was to convey lot No. 12 only, without mentioning lot No. 13. The appellee pointed out the defect, and advised the appellant to rectify it, *or* take an assignment of the appellee's bond of conveyance to *Trueman.* Denies that the appellee ever mentioned an exchange of bonds as stated; or that he ever prevailed, or endeavoured to prevail on the appellant, or any person, to make the exchange. That the appellee advised the appellant to retain money enough in his hands to pay the balance due to the appellee from *Trueman.* That the appellant assured the appellee that there was a sufficiency to satisfy the claim. Denies any payment made by the appellant, but admits the tender. Denies that the appellee agreed to receive the balance from *Trueman;* and never agreed to make a conveyance to the appellant, on any other terms than specified in his agreement with *Trueman.*

HANSON, Chancellor, (May term, 1794.) This cause being submitted on the arguments of the counsel on each side, the bill, answer, depositions, exhibits, and all other

proceedings, were by the chancellor read, and the arguments of counsel considered. He is thereon of opinion, that neither the precedents in equity, nor the principles of justice, require that he should decree, as is contended for on the part of the complainant. Supposing all the papers in the cause filed as evidence to be admissible, (which is by no means certain,) and that they prove the promise alleged in the bill, the case appears to be thus: *Anderson* having contracted to convey land to *Trueman*, and *Trueman* having sold the same to *Tubman*, *Anderson* promises voluntarily, that, to avoid trouble to *Trueman* and *Tubman*, he will receive from *Tubman* the balance due from him to *Trueman*, and convey the land immediately to *Tubman*; although there will still remain a balance due from *Trueman*; that is to say, *Anderson*, considering himself in no danger of losing that balance, is willing to convey before it is paid; and in as much as if he conveys to *Trueman* agreeably to contract, *Trueman* is obliged to convey to *Tubman*, it is better to have one conveyance, which will answer every purpose, than to have a deed first executed by *Anderson* to *Trueman*, and then a deed from *Trueman* to *Tubman*. Under an impression that he can accommodate them both, without detriment to himself, he makes a spontaneous promise, without any stipulation, or prospect of profit. But he perceives, that he cannot perform this promise without considerable loss, and is sensible that his nonperformance will not place *Tubman* in a worse situation than he would have been in provided the promise never had been made; he does not choose to sustain damage merely from his willingness to oblige. It is indeed probable that *Tubman's* situation is better than it would have been independent of the promise, as it prevented him from making any further payments to *Trueman* to his own loss and injury. It is certainly an incontestible position, that a naked promise is not to be considered by any court of law or equity as obligatory in itself, although subsequent circumstances may render it so. Were not this doctrine fully established, the chancellor might perhaps incline to decide, that every promise flowing from the free will, and unbiassed judgment of a person of sound discretion, should be binding in this court, unless subsequent circumstances should make it unreasonable to exact a performance; but even under such a rule the defendant would be acquitted. He has made a promise without a consideration. The complainant's situation is at least as good, as if that promise never had been made; and the subsequent insolvency of *Trueman* renders it unreasonable to require a performance. In short, *Tubman* is entitled to a decree on no better terms than would be allowed to *Trueman* in

case he had been the complainant. He is to be considered merely as *Trueman's* assignee. The balance due from *Trueman* is then to be adjusted. It appears that he contracted for the land at a certain price per acre; but the number of acres is not ascertained by any testimony in the cause, nor is the account between him and the defendant in any point settled so as to lay a foundation for a decree. It is thereupon, this 5th of July 1794 by *A. C. Hanson,* chancellor, and by the authority of this court adjudged, ordered and decreed, that the complainant and defendant account with each other, charging on one side the price of the land according to the contract, and on the other side the payments made by *Trueman,* and the sums due to the state of Maryland from the complainant on the purchase of the land in the bill and answer mentioned, charging also interest on the principles in this court established. And it is further decreed, that the auditor of this court audit and state the account between the parties, and return the same, subject to the exceptions of either party, and to be done with as to the chancellor shall seem just and reasonable.

The auditor, on the 31st of July 1794, reported, that on lots No. 12 and 13. in *Calverton Manor,* purchased of the late commissioners for confiscated property by the defendant, there appeared a balance due to the state of *Maryland* of 122*l.* 17*s.* 11*d.* including interest to the 1st of August 1794; that there is also a balance due to the defendant of 453*l.* 15*s.* 10*d.* including interest as aforesaid, as by statements exhibited.

HANSON, Chancellor, (December term, 1794.) The chancellor having decreed an account between the parties to be stated by the auditor of this court, and the said auditor having accordingly stated and returned an account, it was then agreed between the parties that a certain bond dated the 22d of December 1788, passed by the defendant to the complainant and a certain *Walter Burch,* who is not a party to this cause, [for conveying to them or their heirs the lots No. 12 and 13 on their paying the state of Maryland, &c.] and likewise a copy of the certificate of survey in the land office, of the land, concerning which this suit is instituted, be admitted in evidence on the final decision thereof, the chancellor proceeds to consider how far the said testimony ought to influence his decree. The said bond being executed in pursuance of a contract made by the complainant, inconsistently with that contract with *Trueman,* which is the foundation of this suit, and made too with a person who is no party to the suit, the chancellor conceives that it

ought in no manner to influence his decree, and that the obligees in the said bond must be left to their remedy at law or otherwise. With respect to the certificate aforesaid, the chancellor is of opinion that it ought to have been used as testimony before the cause was set down for hearing, and that it affords good ground for correcting the account stated between the parties. And inasmuch as this cause is of long continuance, and as the account aforesaid is stated by the auditor from the proofs in the cause, the chancellor takes the trouble of stating a new account, correcting the charges in the auditor's report, instead of referring back the account.

"*Henry Tubman*, in account with *Edward Anderson*," &c. &c. balance 461*l.* 0*s.* 8*d.* including interest to the 9th of February 1795, Decreed, &c. that upon the payment of this sum with interest, &c. within one year, the defendant, by a good deed, &c. shall convey to the complainant the said two lots, &c. &c. If the sums due the state of Maryland shall not be paid by the defendant when the said payment shall be due as above, to the defendant, the balance due to the state shall be deducted from the sum directed by this decree, and on paying the balance the defendant shall execute the deed, &c.

The Complainant appealed to the Court of Appeals; and at November term 1797, the case was argued in the Court of Appeals, by

*Martin*, (Attorney General,) and *Key*, for the appellant, and by

*Ridgely*, *Mason* and *Shaaff*, for the appellee.

*Key*, for the appellant. The bill in this case was filed to compel the appellee to procure lands to be conveyed to the appellant, or to let the appellant into a conveyance of certain lands from the state, which were originally purchased by the appellee from the state, and by him afterwards sold to *Trueman*, and afterwards by *Trueman* sold to the appellant. There is yet due to the state a sum of money for *surplus land*, which the appellant is willing to pay to the state, and prays he may be entitled to a conveyance from the state, on payment of this sum, under an agreement made by the appellee, "that the appellant should have a right to the said conveyance upon paying to the appellee the balance which the appellant owed to *Trueman*." The appellee now alleges a balance to be due him from *Trueman*, and the condition of the appellant's obtaining a decree ought to be his paying up that balance. The sole question is, under all the circumstances of this case, on whom should the loss fall, the sum due from the appellant to *Trueman* being *less* than what *Trueman* owed to the appellee. The facts are

JUNE 1799.

Tubman
vs.
Anderson.

few and plain. The appellee purchased certain lands from the state, and has paid off all the state's debt, except what arises on the surplus land, which the appellant is willing to pay. The appellee sold his *equitable interest* to *Trueman;* who sold to the appellant for a less sum than he was himself to give to the appellee. The appellant paid most of the money due *Trueman,* and then the appellee, *knowing of the contract, by parol, and in writing, contracts with the appellant, that if he would pay to him the balance due Trueman, that he the appellee would look to Trueman for the balance of his contract, and a conveyance of the lands should be made to the appellant. Trueman* is dead, and his estate insolvent. Are the facts so? And if so, does an equity arise from them to entitle the appellant to be let into a conveyance of the lands on payment of the balance due to the state for the surplus land? It is charged in the bill, and admitted in the answer, that the appellant, *in pursuance of their contract,* tendered to the appellee the balance which he the appellant owed to *Trueman.* I say *in pursuance of their contract,* because the contract is proved, and the tender was made and is admitted. [He reads certain depositions taken in the cause, and two letters from the appellant to the appellee of the 29th June 1786, and the 13th of December 1787.] In this last letter he requests the appellant, as his friend or agent, to bring *Trueman* to a settlement of the balance, and to get his bond, with security, and give him twelve months to pay it in. The appellant's letter of the 21st of December 1788, to *Trueman*—in this he calls on *Trueman* for the balance of the purchase money, and desires him to settle it with the appellant, who was to act in his behalf. All this was after the appellee knew of the appellant's purchase from *Trueman,* because in his answer he admits he knew of *it in* 1785. See the contract of the appellee to the appellant under seal, dated 22d of December 1788. This powerful testimony shews that the appellee had agreed with the appellant, and his letters, as well as the contract, are an *agreement in writing,* that he would look to *Trueman* for the balance due himself; that he would execute a bond to convey the land to the appellant, and that he was to have from the appellant the balance which the appellant owed to *Trueman;* and he even employs the appellant as his friend to secure the balance on his account due from *Trueman;* that he *was satisfied in the transaction, of the appellant's right to have a conveyance under the agreement.* No reasons can be strong enough to shew the *improbability* of such an agreement between the appellee and the appellant, in the face of such *continued* and strong proof of it. It cannot be said the appellee was *enticed or entrapped into it,* or that he did it under an impression

that *Trueman* was a safe man; because *at the very time* that he was ready and willing to give his bond to the appellant, and to look to *Trueman* for *his* balance, he speaks of *Trueman's* apparent insolvency; but even then, having the loss in contemplation, he was honestly desirous of fulfilling his contract to the appellant. What the appellee's motives were I know not; but his agreement is proved, and his uniform declarations are evidenced through a period of five years, from his knowledge of the appellant's purchase in 1785 to 1790; and even supposing it a *voluntary agreement*, as it was *reduced to writing in his various letters*, where he even employs the appellant to secure to him *Trueman's* balance, and no fraud, ignorance, or imposition proved to exist in the transaction, it appears to me that a court of equity would enforce the agreement as a voluntary contract between the parties, where creditors do not stand in the way. But supposing equity would not support this as a *mere voluntary contract*, yet it appears to me that a court of equity would lay hold *of any the slightest consideration* with a view to enforce an agreement so clearly proved, and so often acknowledged; and in my opinion, a valid and ample consideration exists. That it was a losing bargain on the part of the appellee, may be true, but he entered into it with his eyes open, and the appellant is not the cause of it; and I presume a losing contract, under such circumstances, is not to be annulled. Even at law, an assumpsit may be supported where no possible advantage could accrue to the *promissor; it is a sufficient consideration if a loss accrues to the promissee;* and the principle is not less clear in equity; therefore, to say that the appellee could have no possible benefit in the contract with the appellant, is saying nothing, because the appellant, relying on his promise and contract, may have incurred a loss; and he certainly will if he fails in this cause, to wit, the balance from *Trueman* to the appellee, *more* than he the appellant agreed to give for the land; and equity therefore will interfere if one man, by promising, places another (relying on those promises,) in a worse situation than he was, or induces him by promises to forego a security which he might have obtained. The appellant made a fair contract with *Trueman;* pays him all the purchase money, except a small balance, and then the appellee, the first seller of this land, knowing of the appellant's purchase, tells the appellant, pay to me the balance you owe to *Trueman,* I will make you a title to the lands, or give you my bond so to do, and I will look to *Trueman* for the balance he owes me. The appellee declares this to different persons at different times, through a series of several years, and by letter

employs the appellant to carry it into effect by taking *Trueman's* bond for the balance in his behalf. What was the necessary consequence of these promises and engagements, but that the appellant was lulled into security, in confidence they would be carried into effect, and is now, in the face of that very engagement, to be made liable for money which none of the parties before ever contemplated. Who, and what led the appellant into this situation? The uniform and repeated promises and engagements of the appellee. And is it equitable that a man, in violation of his promises and engagements, shall hold another liable, whom he himself discharged, merely because one whom he resorted to is now dead, insolvent?

I admit the appellee could not have been compelled by the contract between *Trueman*, and the appellant, to take less for his equitable interest in the lands than what *Trueman* contracted to give him for it; but if he in writing assents to take less, *or to look to another fund as his security, than the land itself,* and thereby induces another to lay by to his injury, he loses the benefit of that fund; and the injury that would otherwise be done to such person, creates a consideration in equity, and equity will not suffer the loss to the promissee. The appellee, on the disclosure of the contract to him in 1785, between *Trueman* and the appellant, should have said to the appellant, "there is a large balance due to me from *Trueman* on the purchase of this land; I will not part with my security till that is paid; I will not convey to you before I am made safe." This would have been open, equitable and fair; and in such case the appellant would have had notice to resort to *Trueman* to comply with his contract to him, or give security for a compliance with it. But a very contrary conduct was pursued by the appellee—He promises; he writes letters; "I will give you a deed and look to *Trueman* myself for the balance;" and this conduct is carried on from the year 1785 to 1790, by which means the appellant was prevented from resorting to *Trueman* for security or performance of his contract; and this is an injury arising to him which amounts to a good and valid consideration, which equity will lay hold of to enforce the agreement. The appellant was lulled into security, and could not resort to *Trueman*, because the appellee promised to look *to him.* Had the appellant called on *Trueman*, what would he have said? "Sir, I am not to pay both; *Anderson*, by contract, looks to me; what right have you to meddle; has not he written to you, Sir, that he will convey to you; and has he not written to you to take my bond to him; and has he not, in his letter of the 29th of June 1786, told you to obtain from the chancellor a

deed to me or yourself as may best suit, and what business have you with me, when *Anderson* and myself are to settle?" This is unanswerable; the appellant could no longer look to him; he became insolvent. And can it be possible that the appellant is to lose when the appellee's contract to look to *Trueman* prevented the appellant from securing himself? I hope and trust not. The chancellor goes on a fallacious ground, not warranted by the testimony. One of his reasons is, that the appellant is in no worse situation than he would have been in if the appellee had made no promise. The fact is not so; if the appellee had not promised to look to *Trueman*, the appellant would have made exertions, and secured himself, and not doing so, (owing to the appellee's promise,) the loss must fall on the appellee.

As to the observations which may be made by counsel, that the bill states that the appellee was only to *look to Trueman* for the balance: and a want of specific allegations; they need no reply, further than neither law, reason or justice, require *any set form of words.* The substance is all in all; and if I agree *to look to a man* for a balance, it is just as efficacious and operative as if I *charged him with,* or agreed *to take him* for the balance. The appellee's counsel, before the chancellor, contended we had made no case; for that the fact of *Anderson's looking to Trueman for the balance, is positively denied by the answer;* the more the pity, as it is one more evidence of frequent perjury.

[He refers to *Trueman's* answer, which, if evidence, is full to the point; but if not evidence, he refers to the depositions of sundry witnesses, which were stronger, he contended, if possible; he also refers to the appellee's letter of the 29th June 1786.] The answer in a material fact thus falsified, becomes wholly unworthy of credit.

The appellee will no doubt rely upon the testimony of *Richard Anderson.* He is proved to be brother of the appellee, and I say his deposition is so contradicted that it does not deserve credit, and if it did, cannot outweigh our body of evidence.

*Walter Burch,* one of the witnesses, swears that *Richard Anderson,* at his house, expressed surprise his brother had not come, that he was *to go to Tubman,* and give him *his bond for the conveyance of the lands;* and the letter of the 29th of June 1786, was sent by this very *Richard Anderson* to transact the business, in which letter the appellee writes to the appellant to get a deed from the chancellor to *himself,* or *Trueman,* as *might best suit.* I shall make no comments on such an answer, and such a deposition, although counsel has gravely said, that it

JUNE 1799.

Tubman
vs.
Anderson.

fully proves *"what is stated in the appellee's answer, and really seems reasonable."* That they agree I admit, but that *they are not true* is clear from the testimony. But it has been said, and may again be said, that there is no *express contract*. What is a contract but a promise to do or not do a thing between parties competent to contract? Now it is proved that the appellee, in the presence of a witness, *Basil Waring*, informed the appellant, that he would look to *Trueman* for the balance of the purchase money; and the appellee went a step further, *he said he would not look to the appellant for it, but said he would pay costs, and give him a bond to convey as soon as he got a title from the state, and wished to be put to no further expense*; and this exactly confirms the testimony of *Burch*. *Trueman's* evidence is more to the purpose, if possible. It is objected to, and though he was the man on earth most likely to know the truth, and though he died insolvent since the taking his deposition, and although I believe it legal and competent testimony, I shall not go into an argument to prove it so, because the facts related by him are established in the appellee's own letters, and by the testimony of *Burch* and *Waring*. I wish I could be satisfied by counsel why the appellee wished to save expense and stop the proceedings in chancery, when he observed that *Trueman* was worth nothing, and he never expected a farthing; that he would pay costs, and give his bond.

Upon the whole, I think a contract is proved beyond the power of controversy. But it has been said, if the contract is proved the appellant has no equity; because equity will not aid or enforce a voluntary contract, nor a hard or unreasonable one. I have been pretty full in the first part of my argument, but to put their case in the strongest point of view, (although the appellee's right was a simple equity and not a legal lien as he had no title,) I will admit, that if *Trueman* had sold to forty persons, they could have no remedy against the appellee until he was paid, *without his consent;* but I say, his consent or agreement will put a second purchaser in a better and different situation from what the first purchaser stood in. Suppose A has a mortgage from B of two houses, viz. X and Y, and C purchases one of them from B, but does not pay all the money, and tells him, in the presence of a witness, pay me the balance you owe B, and I will convey to you, and look to the other house and to B for my money. Is it possible to suppose, if the other house is burnt down, or B is insolvent, that A is not bound to convey? To be sure the reasoning is singular; A has a *lien* on both—there is no consideration; it is mere accommodation on his part; he must be paid all, or C can-

not get a conveyance. These are not reasons in equity; they are not principles of common honesty. The fact is, "that wherever one man promises to do an act in favour of another, and such person, relying on the promise, sustains an injury, the person promising is liable."—*Powell on Contracts,* 344. 1 *Roll. Ab.* 22. *pl.* 23. *Dyer,* 272, *pl.* 31. Our case is like the one I put; the appellee has a claim against *Trueman; Trueman* sells to the appellant; the appellee, in presence of *Waring,* says to the appellant, if you will pay me the balance you owe to *Trueman,* I will convey to you, and look to *Trueman* myself, *and not to you.* The appellant in consequence of this lays by; is employed by the appellee to get *Trueman's* bond for the balance; in a few years *Trueman* becomes insolvent, and then the appellee says the loss shall fall on the appellant. If this be equity in court, it is very differently understood out of court; for the appellee went to Charles county, where the appellant lived, knowing his engagements, in order to settle the business, stop the commission, and save expense; and said he would pay costs and give his bond of conveyance. I have always thought the case a strong one; that the contract was fairly proved; fairly understood when entered into; no fraud or imposition practised; and that the appellee's contract to the appellant, by preventing him from resorting to *Trueman* to be indemnified, is such a one as a court of equity will sustain, and is not voluntary in respect to the injury done to the appellant, which gives him a right to redress. And that the rule is not *"whether a promissor gains a benefit or not,"* but where a *"promissee," relying on a promise, sustains an injury, it creates a good consideration "against the promissor,"* equally as in the first case.

The chancellor has mistaken *two facts* in his decree— "that *Anderson* considered himself in no danger of losing the balance"—See *Burchs's* deposition, where he proves "that *Anderson* told him he expected to lose the balance from *Trueman."* Again, the chancellor says, that *"Anderson* was under an impression that he could accommodate both without detriment to himself, and therefore spontaneously promised." This is expressly contradicted by the appellee's own declarations, as proved by *Burch;* nay, when the appellee went to Charles county to *pay costs and stop the business,* he knew or thought he should lose the balance from *Trueman;* so proved by *Waring. How could it be said that he considered* himself in no danger of losing, and it was mere accommodation, when *Waring* swears that the appellee said he expected to lose the balance, and yet went down on purpose to pay costs, stop the proceedings, and give the appellant his bond to convey; and when *Burch* swears the appellant

JUNE 1799.

Tubman
vs.
Anderson.

was sick in bed, and could do no business, when the appellee went to him to make the settlement.

Something is hinted at *Trueman's* insolvency, but nothing proved; and the rule is *de non apparentibus, et non existentibus eadem est ratio.* The fact was not so at the time, but if it had been, the appellant, relying on the appellee's promise, was prevented from suing and holding him to bail; and hence an advantage was foregone, which the appellant would have had but for the appellee's promise; and this brings his case within the law cited, and *a fortiori*, within the principles of equity. The appellee's engagement with the appellant amounted to this, that if he would forbear to sue *Trueman*, or hold him to bail, or take steps to secure himself, he should not suffer; and this is a good consideration in law—*Bidwell vs. Catton, Hob.* 216, cited in *Powell*, 346. But I take it for granted, as there is no *proof* of *Trueman's* insolvency on the record, it is unnecessary to shew what is the law even if he was insolvent, and that the appellee's promise still occasioned a prejudice to the appellant, by preventing him from suing and resorting to bail. *Trueman* was an officer in the service of Congress, of good connexions, who, if the appellant had arrested him, would have bailed him, and secured the debt, sooner than let him go to gaol. I believe this is improper, but the court will perceive that it is forced from m·· to answer hints of an insolvency not proved. I trust they will excuse me.

I confidently expect the decree of the chancellor will be reversed, and that the appellant will be entitled to a conveyance on payment of the balance he owed *Trueman*, which he tendered to appellee, as is admitted.

*Shaaff*, for the appellee. The object of the bill is for the appellant to have a conveyance upon paying the sum he owed *Trueman*. The first circumstance which strikes the mind in the consideration of this subject, is the difficulty to find out a motive for the appellee's agreeing to convey his land to the appellant upon terms different from those upon which he was bound to convey to *Trueman*, who originally bought from him. By the contract with *Trueman*, and the appellee, the appellee could not have been compelled in equity to convey before the payment of the whole purchase money. What reason then could have induced the appellee to agree to a conveyance to the appellant on the payment of the money due from the appellant to *Trueman*, when that was a much less sum than was due to the appellee on the original engagement? If such a contract was made it must have been a mere voluntary agreement, unaccompanied with any good or valuable consideration to justify a court

of equity in exercising its discretionary power to decree a specific performance.

Before I consider the general subject of the cause, I will call the attention of the court to the bill of the appellant, and I presume it must be admitted, that if the appellee did not in some way agree to convey the land to the appellant, on his paying the money due to *Trueman,* that the appellant will only be entitled as the assignee of *Trueman.* The bill states, that the appellee agreed to take from the appellant the money due from him to *Trueman,* and *to look* to *Trueman* for the balance; and that, at the solicitation of the appellee, the appellant delivered to *Trueman* his bond of conveyance, and took an assignment of the appellee's bond to *Trueman.* It must be remembered, that by the original contract *Trueman* alone was debtor to the appellee, and that the appellant never owed the appellee any money in the whole of this transaction; consequently, although the appellee might be willing to receive part of the money from the appellant, or any other person, yet still, in point of law, he had nobody to *look to* for the balance but *Trueman,* who was his sole debtor. The bill does *not* state that the appellee agreed to convey on payment of what was due from the appellant to *Trueman,* but only that he would *look to* him for the balance, which by law he was bound to do, as he had no legal claim against the appellant; and notwithstanding the appellant, as assignee of *Trueman,* could not oblige the appellee to convey until payment of the purchase money, yet the appellee had no legal remedy to recover that money from him as there was no contract between them. If this is correct, the appellant appears not to have stated a case in his bill to entitle him to relief on any other terms than *Trueman* himself would have been, on an application by him; and should it be contended, that by inference it may be collected, it may be answered, that in the course of judicial proceedings such certainty is required as to leave no ambiguity on the subject, and that in a court of justice a man must not only have a good cause of action, but that cause of action must be set forth with certainty and precision, and that a defect in either particular is equally fatal. It may here be further remarked, that no fact which is necessary to support the case of a complainant, which is not stated in the bill, or admitted by the answer of the defendant, can be supplied by proof; because nothing is in issue but what is stated in the proceedings between the parties, and any proof offered to any other facts must be irrelevant to the subject. In the present case, therefore, if sufficient facts are not stated to entitle the appellant to a decree, no proof taken in the case can supply the defect. Sup-

JUNE 1799.

Tubman
vs.
Anderson.

posing the proceedings regular in this respect, the case may be considered under two general questions: *First*—Whether the appellant has established his case by sufficient evidence. *Second*—Whether, if the appellant has fully proved the case as stated, he will, according to the principles of equity, be entitled to a decree for a specific performance.

The *first question.* The bill states, that in 1785 the appellant bought of *Trueman* land which the appellee had sold to *Trueman,* and passed his bond to convey it; and that in *May* 1787 the appellee agreed to receive of the appellant the sum he owed to *Trueman,* and *look* to *Trueman* for the balance, &c. The fact is *positively denied* by the answer, and of course the appellant must establish it by proof. It is first to be observed, that the appellant has produced *no written* evidence to shew that the appellee has made any express engagement, as stated in his bill, but seems to rest entirely on the security of the assignment of the appellee's bond of conveyance. This circumstance strongly indicates the appellant's idea of the contract, and that he claimed solely as the assignee of *Trueman;* and it is hardly presumable, that if there was any express agreement of the appellee in this case, he would not at least have taken a memorandum in writing from the defendant, evidencing the contract.

The appellant certainly thought at the time of purchasing the land, and for some months afterwards, that he stood in no better situation than *Trueman* himself, and it was long afterwards before a different idea was taken up, as an examination of the evidence will discover.

*Richard Anderson* proves, that in August 1787, the appellant was at his house. That the appellant told the witness, that he was to have a conveyance for the land as soon as a survey was made; that the appellant also informed the witness, that he, (the appellant,) was to pay the full balance of the purchase money, and interest, then due from *Trueman,* to the appellee. That he the appellant had retained sufficient in his hands for that purpose, and that *Trueman* had failed and was insolvent; and that the appellee looked to the appellant, and not to *Trueman,* for the balance of the purchase money, and interest. This deposition fully proves what the appellee has stated in his answer, and really, what seems the only reasonable or honest understanding of the parties, viz. that the appellee should not be bound to part with his security on the land until he was paid for it. But this deposition discloses another fact, which renders it impossible to suppose that the appellee could have made such an agreement as the appellant contends for, because it establishes the insolvency of *Trueman* from the appellant's own

acknowledgments in August 1787; and it can hardly be presumed the appellee would have made the engagement to convey and take an insolvent debtor as his security. The contract with *Trueman* and the appellant, was in May 1787, and the acknowledgment in August following.

The evidence for the appellant is next to be considered. *Basil Waring* proves, that in May 1790, upon the execution of a commission in this case, he heard the appellee say, and tell the appellant, that he the appellee was to look to *Trueman* for the balance of the money, and would convey the land to the appellant as soon as he received a conveyance from the state.

*Walter Burch* proves, that he has often heard both the appellant and appellee speak about the present suit; and on the 28th of December 1788, he heard the appellee say he expected to lose the money *Trueman* owed, all except 2 or 3 hogsheads of tobacco, which the appellant had reserved for him—has heard the appellee say so several times. That in the spring of 1790, on the execution of the commission to take depositions in this case, the appellee said he was going down to put a stop to the commission being executed; that it was putting him to unnecessary expense, as he never expected to get any more from *Trueman,* but if he was able he supposed he would pay him. The rest of his deposition is hearsay.

There are some letters from the appellee which seem to discover apprehensions of the loss of his money, through the insolvency of *Trueman,* but none of which prove any thing like the contract stated.

In this part of the subject we are endeavouring to examine if there is any evidence of an express contract as stated, viz, to convey the land to the appellant on payment of the money due from him to *Trueman;* and certainly there is not the least evidence of that fact. The depositions of *Waring* and *Burch* only prove, that the appellee *looked* on *Trueman* as his debtor, not from having made any contract to that effect with the appellant, for nothing of that kind is proved, but I presume, through ignorance of the operation of law, supposing that the arrangement which was made between *Trueman* and the appellant bound him to convey on the assignment of his bond of conveyance. This seems the only rational way of reconciling the evidence of these witnesses to the declarations of the appellant, as proved by *Richard Anderson* in his deposition before mentioned, or to common sense; and it is very easy to see how the appellee was led into the error. In the contract between the appellee and *Trueman,* the latter gave his bond to the former for the purchase money, and the appellee gave

June 1799.

Tubman
vs.
Anderson.

his bond to *Trueman* to convey him the land on or before the 25d of September 1785, and does not make the payment of the purchase money a condition. Upon this bond it would have been no defence for the appellee, in a court of common law, that the purchase money was not paid, although upon an application to a court of chancery, (as the present is.) for a specific performance, the court would never decree a performance on any other terms than the payment of the money. Hence the appellee, ignorant of those distinctions between the proceedings of courts of equity and courts of law, might well suppose that he was bound by the terms of his bond to convey, even before the payment of the purchase money, and this alone has given rise to the declarations proved by *Waring* and *Burch*. But the appellant seems to have entertained a different idea; for *Richard Anderson* proves, that he told him, but a short time after the alleged contract, that he was accountable to the appellee for the purchase money. The deposition of *Alexander Trueman* taken *de bene esse*, is more full in favour of the appellant's allegations. The deposition, if it was admissible to be read in evidence, is in direct contradiction to the answer of the appellee on oath; also to the express declarations of the appellant, as proved by *Richard Anderson*. And we may certainly think, that the appellant himself was as well acquainted with the transactions as *Trueman* could be. Hence we may fairly conclude, that *Trueman* was mistaken in his idea of the contract. But *Alexander Trueman* appears clearly interested on the face of his deposition, and incompetent in point of law. It must be remembered that *Trueman* was always liable to the appellee for the purchase money, and never was released from his engagement. He made a second contract with the appellant to convey him the land, which contract he never could have complied with until he paid the purchase money to the appellee, and consequently on the non-performance would be liable to the appellant on his breach of contract. *Trueman* has broken his contracts with both appellant and appellee, and his own evidence is now brought forward to prove that the appellant is entitled to a conveyance without paying to the appellee the full purchase money due him, and by that means save himself from his breach of contract with the appellant for not conveying his land according to agreement. The appellant might be put to great damage by being obliged to pay the appellee the balance of the purchase money due to him from *Trueman*, and of course would be entitled to recover it from *Trueman*; and if *Trueman* is permitted to prove that the appellant is not liable to pay this money, he, by his own oath, frees himself from the inconvenience.

If this deposition is not considered to affect the case, there is no evidence in the cause to establish the allegations of the bill. But should the deposition be supposed competent, yet the point of view in which *Trueman's* evidence appears in this cause, will render it insufficient to overbalance the acknowledgments of the appellant himself upon the subject, as proved by *Richard Anderson.*

*The second question,* Whether, if the appellant has proved the case as stated, he will according to the principles of equity be entitled to a decree for a specific performance?

This is the only ground on which the chancellor in his decree has taken up the case; and on this ground the objection to the appellant's recovery appears to be solid, and perfectly correspondent to the principles which govern a court of equity. The present application is for the specific execution of a contract, in which case the court will look into the whole transaction, and exercise its legal discretion. It is not every contract which the court will decree an execution of, but in many instances a court of equity will leave the party to his remedy at law. If the contract is hard and unreasonable, although no actual fraud is proved, yet the court will not decree a specific performance, but will leave the party to his remedy at law—*Young & Clerk, Prec. in Cha.* 538. 2 *part* 1 *Eq. Ab.* 18. If a contract is merely voluntary, and without consideration, a court of chancery will not decree a specific performance—2 *Powell on Cont.* 242. This doctrine is too well established to make it necessary to produce any further authorities to support it; and on examination it will be found that this case comes fully within these principles. It is not contended that the appellee has received his purchase money; and it would be hard, and unreasonable in the extreme, to make him part with his security on the land before he had received the price for it, on account of any incautious promise he might have made, from which he derived no kind of advantage, but which was wholly made to accommodate the appellant. The appellant, at the time he originally bought the land from *Trueman,* well knew the situation of this property with respect to the title, and must have bought it on the faith that *Trueman* would enable himself to make a good title to him, and if any loss happens by the insolvency of *Trueman,* it should fall on the appellant, who alone gave credit to *Trueman,* and not on the appellee, who had nothing to do with this part of the business. The appellant, if he does not succeed in this suit, will be in exactly the same situation he was at the time of the supposed contract between him and the appellee for the conveyance of the land; and if he does succeed the appellee will lose

a large sum of money which he ought to recover. But as the chancellor very justly observes in his decree, the arrangement stated to have been made between the appellant and appellee was the reason why the former paid no more money to *Trueman,* and by this means saved himself from any further loss on account of his insolvency. But the contract, if ever so fully proved, is decidedly a voluntary agreement without any consideration, and of course such a one as the court will not decree a performance of. It is only necessary to have recourse to the proceedings in the cause to prove this, because taking both the statement and the proof in their utmost latitude, they only prove this, viz. That the appellee, without any kind of consideration, promised to convey the land to the appellant, and depend on *Trueman* for payment. Here then is nothing more than a mere voluntary engagement, which according to the authorities of law, and the established principles of equity, is not sufficient to justify a court of chancery to decree a specific performance.

Upon these observations, this cause is submitted, under a full conviction that the decree of the court of chancery ought to be affirmed; because, the appellant has not stated such a case as will entitle him to the relief prayed for; because he has not established his case in evidence, as contended for by him; and lastly, because, even if his case was fully stated and proved, yet it is not such a one as the court of chancery will decree-a specific performance of.

*Ridgely,* on the same side. In addition to the authorities cited by the counsel who had preceded him, he called the attention of the court to others which he deemed applicable to the case before them. A *consideration* is a material cause of a contract or agreement, in expectation of which the party is induced to give his assent to what is stipulated—1 *Powel on Contract,* 330. The law will not bind a man to an executory contract, entered into by *words only,* if it be not founded on *a good or valuable consideration.* The uniform practice of the court of chancery is to refuse, unless under particular circumstances, to aid even a covenant *under seal,* if voluntary; for the principle upon which that court withholds its interposition in those cases is, that nominal damages only can be obtained as law; and therefore equity, which follows the law, will not give a more substantial relief— 1 *Powel on Cont.* 342. Every agreement to merit the interposition of a court of equity in its favour, must be *fair, just,* &c. made *upon a good* or *valuable consideration,* not *merely voluntary,* and free from circumvention or sur-

*prise*; if any of these impediments are wanting, courts of equity will not decree a specific performance—2 *Powel on Cont.* 221. A consideration of some sort or other is so absolutely necessary to forming a contract, that a *nudum pactum*, or agreement on *one side* without *any compensation* on the other, is *actually void in law*, and a man cannot be compelled to perform it—2 *Blk. Com.* 445. 1 *Fonb. in Eq.* 326. Our law considers verbal agreements unless sanctioned, or *induced by some consideration express* or *implied*, as absolutely void, or *nuda pacta.*— *Plow.* 308, b. *Dyer*, 336, b. *Fonb.* 3$2. In equity there must not only be a *consideration* as a motive for relief, but it must be a stronger consideration than there is on the other side—1 *Fonb.* 342.

If agreement is *unreasonable*, equity will not interpose —2 *Bro. Pa. Ca.* 183. 2 *Eq. Ab.* 55.

One is not bound by his *assumption* or *promise*, unless it be on *good consideration* of another thing—*Grounds and Rudiments of Law and Equity*, 18.

*Pinkney*, on the same side. *(a)* This bill is filed to compel the defendant to convey, or procure to be conveyed, to the complainant, certain land bought by the defendant from the state, by him sold to *Alexander Trueman*, and by *Trueman* sold to the complainant.

The legal title still remains in the state; part of the purchase money is yet due to government on account of surplus land found on survey, which was not included in the original estimate of the quantity. *Trueman* is still indebted to the defendant in a considerable balance on the contract between him and the defendant; and the complainant is in arrear to *Trueman*, but to a less amount than *Trueman's* balance to the defendant.

It is admitted on all hands, that as the terms of the complainant's decree, he must be required to pay to the state the balance due for surplus land as above mentioned, and to pay to the defendant the balance due from the complainant to *Trueman*. But as this balance is less than that due from *Trueman* to the defendant, it becomes a question whether the complainant is liable to pay the difference as one of the conditions of his decree. This difference, (on account of *Trueman's* failure,) must be sunk by one of the parties, and we contend that the loss ought to be the complainant's.

If the complainant be considered merely as *Trueman's* assignee, or as a purchaser of his equitable interest arising out of the defendant's sale, it is clear that the complainant has no case but upon the terms insisted on by us.

*(a)* This was Mr. *Pinkney's* argument before the chancellor.

JUNE 1799.

Tubman
vs.
Anderson.

He therefore sets up particular circumstances as a ground of equity, out of the general rule, and depends upon a subsequent contract to protect himself from this loss, and fix it upon the defendant. The bill alleges, "that after the complainant had bought of *Trueman*, and had paid all but a small part of the purchase money, the defendant prevailed on him to give up *Trueman's* bond of conveyance, and take an assignment of that given by the defendant to *Trueman*; and agreed to receive from the complainant the balance due from him to *Trueman*, and to look to *Trueman* only for the residue of the purchase money for which *Trueman* was in arrear to the defendant." And it further states, "that the defendant promised to convey to the complainant upon the above terms." This the answer positively denies, and states the transaction in a manner entirely different, so as, if true, to destroy every pretence of equity alleged in the bill.

It is to be inquired therefore, 1st. Whether the complainant has proved the above allegations by the testimony in the cause; and 2d. Whether these allegations, if proved, give him any equity?

*First*, I shall make no particular observations on the testimony, but shall submit it to the chancellor with these general remarks.

The very nature of this pretended contract furnishes strong evidence against the existence of it. The defendant had no possible inducement to enter into it; there was a certainty of loss, and no hope of benefit; and yet he is represented in the bill as being anxious for the completion of it. He had already received from *Trueman* a sufficiency to make the land ample security for the balance due; as well as for the arrears due to the state. He had received 693*l*. 5*s*. 1*d*, and could not be compelled to part from the thing sold until the residue was discharged; by entering into the contract stated in the bill, he is made to give up abundant security for the whole remainder of his debt, and to accept in lieu of it a portion only of that remainder, which portion too it was in his power to have obtained without any sacrifice at all. On the other hand, the complainant who was to profit all by this agreement, is represented as being backward to enter into it; when it is evident he could not by any possibility be a loser, and must of necessity be a gainer; for without this contract, he must have paid up *Trueman's* balance before he could have got a title; and unless he got a title he sunk all his former payments which *Trueman* was in no situation to refund. The state of the transaction by the defendant is a probable one—*Trueman's* bond to the complainant was defective, and there was no necessi-

ty to have two bonds on the subject; an assignment of the defendant's bond answered every purpose as well. This statement accounts for *Trueman's* bond being given up, without giving rise to the inference that the defendant was therefore to convey to the complainant as soon as the balance due from the complainant to *Trueman* was paid to the defendant.

And it is proper to be remarked, that if such a contract was made at this time, as is now alleged, there would have been some memorandum of it in writing. So essential an agreement would not have been left without authenticity, so as indeed to make it a merely honorary engagement. The complainant appears to have been cautious enough on all other occasions, and yet on this occasion, where he was prevailed upon to accept the proposition with some difficulty, he leaves every thing to future recollection, and does not even endeavour to secure the parol contract from misrepresentation by the ordinary precautions generally used. There was nothing in the fact of one bond being given up, and another assigned, that bespoke such an agreement as this; and yet we find, that although as to giving up *Trueman's* bond, and assigning the defendant's, every formality was observed, the most essential circumstance of all, (*i. e.* the defendant's promise,) was permitted to pass without any formality whatsoever.

If to these considerations is added that of the defendant's having pointedly denied the complainant's statement in his answer, it will appear that the proof in favour of that statement must be very strong before it can be taken as a ground upon which to decree.

*Secondly.* I do not think that the allegations, if proved, entitle the complainant to redress on any other terms than those we have mentioned. When one man sells land to another, and the seller afterwards prevails upon or induces a third person to purchase the equitable interest of his vendee at a less sum, and promises him that he will look to the first vendee for the surplus of his purchase money, and afterwards the first vendee fails, the purchaser under him is clearly entitled to a conveyance from the seller, upon paying up only the purchase money which he contracted to pay, though less than the sum which the original seller had sold for; and the reason is, because the first seller induced the second purchase, and having thus given rise to it by his own act, he shall be bound to carry it into effect.

But in the present case the complainant purchased without any inducement from us. He had paid his money to *Trueman* without being encouraged to do so by the defendant. He had undertaken to act of himself, and

June 1799.
Tubman
vs.
Anderson.

to risk the completion of *Trueman's* title. He might, if he had thought proper, have secured the full payment of the purchase money due from *Trueman* to the defendant. He certainly knew the nature of *Trueman's* claim, and that his bond had not been discharged, and with the means of discharging it in his own hands it was his own fault if he proceeded to part from those means by making his payments entirely to *Trueman*. With a view to the purchase from *Trueman* therefore, and the complainant's payments to *Trueman*, the defendant was not in fault; for even if he knew of both, it was not his duty to have interfered, as he was not obliged to convey till his debt was satisfied—on the other hand, the complainant was greatly in fault, and from his fault alone has the present dispute arisen; with the power of satisfying all parties, and procuring *Trueman's* balance to the defendant to be discharged, he did nothing of the kind. He was not entrapped or deceived into any of these measures by the defendant, and does not even pretend ignorance of the circumstances of *Trueman's* title or debt; on the contrary, it appears that he was acquainted with them. He was brought into the situation in which he was placed at the time of the exchange of bonds alleged by him, purely by his own acts, without a pretence of imposition on our part.

Under these circumstances, it appears to me that the contract by parol, said to be made by the defendant, that he would receive the balance due from the complainant to *Trueman*, and look to *Trueman* for the residue of his purchase money, is no ground of relief in this court. The complainant comes into this court as *Trueman's* assignee, against whom, and against all the world claiming under him, the defendant had a lien upon the property sold for the amount of the original purchase money, and was not compellable to transfer to any person till that purchase money was discharged. If he has made any subsequent contract by which he has lost this advantage, it must be shown that such contract is sufficient in equity; that it was fair; that it was not made under mistake or misapprehension; that it was for a *valuable consideration;* or *that the person with whom it was made has in consequence of it lost some advantage he would otherwise have had, or been betrayed into some loss which he would not otherwise have sustained.*

That this contract was without consideration is obvious; the defendant gained nothing by it, but submitted to a *certain loss.* He gave up the land which he might always have held till fully paid, and was to receive only a portion of the balance due from his vendee, which portion it was always in his power to secure in a different man-

ner, and which too the complainant would have been obliged to pay to him before he could have obtained a title. The complainant lost no advantage by this contract which he would otherwise have gained; at least I can conceive none; and he was betrayed into no loss of any kind by it. All his payments had been previous to it; his purchase had been previous.

The very foundation of this contract, and that which led to it, was the complainant's own imprudence in making payments to *Trueman* beyond what he ought to have made. His misconduct therefore, and that wilful too, is the only consideration of this agreement by which he gains every thing, and the defendant loses every thing. Such an agreement, though ever so positively established, can never justify this court in decreeing a conveyance till the seller is indemnified. If such a contract ever was made, it must have been owing to a misapprehension in the defendant; he might have imagined that he was bound to do what he is said to have proposed; or he might have thought the balance due from the complainant to *Trueman*, equal to that due from *Trueman* to him.

The nature of a bill for specific performance puts it in the power of this court to do justice between the parties. The loss of *Trueman's* balance has been occasioned by the complainant, not by us; and in point of equity he ought to bear that loss. He ought to have retained enough in his hands to have paid it. And if he did not choose to do so, no inadvertent subsequent promise on our part ought to protect him from the consequences of his obstinacy or neglect, and saddle them upon us. The demand is unconscientious and unreasonable, and a mere voluntary verbal offer on our part, which led to nothing disadvantageous on theirs, or for which they sacrificed nothing, is not a proper foundation to support it.

It has been intimated by the counsel for the complainant, that the agreement in question, although *merely voluntary*, is proper to be decreed by this court.

A voluntary agreement *between strangers* is never enforced in equity where *no* damages, or only *nominal* damages, are recoverable on it at law—*Pow. on Contracts.* At law a parol promise, (or even a promise in writing except in the case of a *mercantile* transaction,) without consideration, would not maintain an action of assumpsit. It is common place law that such a promise is "*nudum pactum unde non oritur actio.*" This agreement is entirely *verbal*, although it is said to be mentioned in some of the defendant's letters to the complainant. The letter of the 29th of June 1786, (which is referred to,) contains no such agreement, and in fact the bill does

not allege the contract to have been made till the year 1787, in May. This letter does, I acknowledge, empower the complainant to take a conveyance from the chancellor to himself; but it does not say that *Trueman* alone is to be responsible for the purchase money. The probability is, that the defendant considered his claim against *Trueman* at this time as secured by the complainant's purchase, and that the complainant had retained in his hands sufficient to discharge it. Either the complainant had agreed so to retain, or he had not; if he had, he has no case; if he had not, the offer contained in this letter was completely *voluntary*, and without the shadow of a consideration, and of course, though in writing, no ground for an action at law or a bill in equity. It is observable, however, that this proposal was not accepted, and is therefore out of the cause; and it is further observable, that at this period the complainant owed *Trueman* to more than the amount of *Trueman's* balance to the defendant. The complainant's counsel endeavours to shew that the pretended contract in 1787 was on sufficient consideration; but surely it is impossible to prove this. I admit, (and have before admitted,) that a consideration to sustain a promise at law, or in this court, may be various in its nature.

If the promissee makes any sacrifice; if the promissor gains any advantage, or obtains any new right; or if there is a precedent equitable or moral obligation which the promise is calculated to comply with, assumpsit will lie upon it. I do not perceive that any of these considerations exist in the present case.

1st. The complainant made no sacrifice of any kind. It is not pretended that he *paid* any thing as the consideration of this promise, or that he *did* any thing by which he suffered a loss. Admitting then that he, on his part, *contracted* to pay or do any thing, (which I deny,) what is it? To pay to the defendant, (as the means of obtaining a title) less than he was before obliged to pay in order to accomplish the same object. This was not an agreement by which he was to sustain a loss, or make a sacrifice, but very much the contrary.

2d. The defendant gained no advantage, and acquired no new right of any sort. He certainly received nothing at the time; and the complainant's agreement, (admitting him to have entered into any,) gave him no right to demand any thing as preliminary to a conveyance which he had not before an equal right to demand. He *gave up* a part of his original right, but he obtained no new one. Before this contract he was entitled to receive the whole balance of his purchase money; by this contract he is supposed to have relinquished a portion of that balance, and

to have *reserved*, (not *acquired*,) the right of demanding the residue as a condition precedent to the transfer. The complainant does not even allege that he, (on his part,) bound himself to pay any thing; whereas the defendant, (as the bill insists,) bound himself to convey on payment of the balance in the complainant's hands due to *Trueman*. According to the complainant's statement, it was perfectly optional with him whether he would pay or not; but with the defendant it was not discretionary whether he would convey or not; so that on one side there was an agreement positive and obligatory, as the complainant says, and on the other side no contract of any sort. How did the defendant then obtain any hold on the complainant for any part of his balance which he had not before? Unless relinquishing and acquiring are the same thing, the defendant certainly obtained nothing; and it will not be urged that a *sacrifice* made solely by a promissor was ever held to form a consideration to support a promise.

3d. There was no precedent equitable or moral obligation. The original bargain between *Trueman* and the defendant was in all respects fair, and for no more than an adequate price, and consequently it could not be unconscientious to demand from *Trueman*, or his assignee, complete performance of it. The complainant bought *Trueman's* equitable interest, with full knowledge of all circumstances, and without any idea that a conveyance was to be made until the defendant was fully paid. The complainant might have saved both himself and the defendant without any kind of inconvenience; but for some cause, not yet explained and really incomprehensible, he did not choose to do so. He was well apprised of the defendant's anxiety to secure his balance of the purchase money, and the danger of its being lost; and, with the means of preventing that loss in his own hands, he wilfully omitted doing so. From the commencement to the close of the transaction he acted with his eyes open; and to his fault, and not the defendant's, the present existence of *Trueman's* balance is wholly ascribable. He could not therefore have any pretence equitable or moral to require the defendant to convey till his claim was fully satisfied. *Trueman* himself would have had precisely as reasonable a pretence. And surely it would not be contended that such a promise, as is now set up, would, if made to *Trueman*, have entitled him to a decree on the terms pointed out by the complainant's counsel.

It is next to be inquired, if any thing subsequent has given to this agreement a validity in this court which it did not originally possess.

It is said that the complainant was lulled into a security, and thus lost his opportunity of indemnifying himself

against *Trueman*. Independent of the consideration that the necessity for indemnification was brought upon him by his own fault in paying *Trueman* beyond what was prudent, at a time too when he was acquainted with the propriety of retaining the means of satisfying the claims of the defendant; the argument is inadmissible. It does not appear that this indemnification ever could have been obtained; but the probability is greatly against it. It is represented to have been the defendant's interest to have procured from *Trueman* the balance of his purchase money; and yet he never has been able to do so, although it is stated, that from the year 1787 to 1790, he looked only to *Trueman* for his balance. It is not very likely, therefore, that the complainant could have succeeded; nor is it likely from circumstances that he ever would have attempted it. It is probable that (if this agreement ever was made,) it has induced the complainant to retain in his hands the small balance still due to *Trueman*, which otherwise he would have paid over to him; and that instead of his being prejudiced, as his counsel supposes, he has been benefitted to the amount of the sum now in his hands unpaid to *Trueman*. *Trueman's* situation appears to have been desperate for many years past, and always to have precluded the possibility of this indemnification, which is now thought to have been practicable. It appears that sufficient efforts were made to bring him to a settlement of the defendant's balance, and always without effect.

Upon the whole, it is submitted to the chancellor, whether if this agreement be proved it creates the equity insisted upon. I conceive it does not, and that even upon principles of common justice, abstracted from the law of this court, the complainant must fail.

*Key*, in reply. The appellee's defence appears to be grounded on two principles—*First*, that the appellant has not proved a contract between himself and the appellee; and *secondly*, that if proved it does not raise an equity on which the court will decree a performance.

In answer to the *first* objection, it may be said, that where the party admits the agreement it is not incumbent on the complainant to prove it—2 *Eq. Ca. Ab.* 44; "because, when the defendant confesses it, there is no danger of perjury, which was the only thing the statute intended to prevent." The answer states that the appellee never agreed to make a conveyance to the appellant upon any other terms than those agreed upon between him and *Trueman*; then it admits the principal point, to wit: an agreement, but denies the particulars, as stated in the bill. To prove those particulars, recourse must

June 1799.
Tubman
vs.
Anderson

be had to the testimony of *Waring* and *Burch*, both of whom swear that they heard the appellee say he expected to lose all the balance *Trueman* owed him, except what the appellant had in reserve for him; and that he would convey to the appellant so soon as he obtained a conveyance from the state; which clearly proves the terms of the agreement; and the principal point, to wit: the agreement itself, is admitted, which acknowledgement is an unanswerable and conclusive confirmation of the proof of *Waring* and *Burch*. It is not necessary to prove both the agreement, and the terms of it, by the same sort of testimony, for if a complete and full contract is made out partly by the admission of the party, and partly by positive and collateral evidence, it will be sufficient to authorise a decree. The letter also, if it states the terms of the contract, will be sufficient to take the case out of the statute of frauds, and establish the stipulation between the appellant and appellee.

As to the *second* point of defence, that the appellant has no equity, it may be necessary to observe, that the appellee's counsel has admitted (and so is the law,) that a *profit* to the *promissor*, or a *loss* to the promissee, will be a *good and valid consideration*, both in law and *equity*, to *support a promise*; then, if it can be proved that the appellant in this cause will sustain an injury in consequence of confiding in the appellee's engagement, unless performance is decreed, it will be a sufficient ground for a reversal of the chancellor's decree, and will be likewise a decisive answer to the objection that the case is destitute of equity, and that part of the appellee's defence falls to the ground as inapplicable to the question. To prove that he has sustained a wrong, and has foregone a power of indemnification, by an unhappy confidence in the promise of the appellee, a short statement of some facts in the case, proved and admitted, is alone necessary. The appellee prevailed on the appellant to give up *Trueman's* bond of conveyance, and take an assignment of his bond to *Trueman*, which happened at a time when *Trueman* was in solvent circumstances, and capable of refunding the money paid by the appellant to him; and whether any further payments would have been made by the appellant, is not now to be said, and cannot be ascertained. It is further contended, that the title does not take the case out of the statute, because the terms of the agreement are not particularly mentioned in it — whether it does or not, appears to me to be wholly immaterial to a fair and proper decision of this question; and although the agreement be verbal, yet the uniform and constant determinations of the court of chancery have been, that part execution will take the case out of the

statute. *2 Eq. Ca. Ab.* 44—"a court of equity will re-
lieve in a case of a fraud, although there be nothing in
writing to charge the party, as if A. agrees with B. by
parol, for a lease of a piece of ground, B. enters and
builds, and then A. refuses to grant him a lease; on a bill
brought by B. to have an execution of this agreement,
A. pleads the statute of frauds; the agreement being only
by parol, his plea was overruled, and he was compelled
by the decree to perform the agreement and pay costs"—
for it never was the intention of the law to protect, but
to prevent fraud; and if the appellee could i . this case
avoid the fulfilment of his engagement, after prevailing
on the appellant to change his security for a conveyance,
and by that means discharge *Trueman*, it would evident-
ly be fraudulent and dishonest; and the appellant has as-
sented to the appellee's promise to convey by executing
that part which, from the terms of the contract, it was
incumbent on him to perform. And this part execution
destroys as well the force and applicability of that part
of the defence which is founded on the statute of frauds,
as that which says the appellant never assented to the
appellee's promise.

*Martin,* (Attorney General,) also in reply. After the
full and accurate arguments already made in this cause,
I shall make but a very few observations.

With regard to the evidence of *Alexander Trueman*,
there can be no doubt but that he was a legal and com-
petent witness. He could not be considered interested.
If the appellee was obliged to convey to the appellant,
without the appellant's paying up the whole balance of
the purchase money due to the appellee, then *Trueman*
remained the appellee's debtor to the amount. If on the
contrary the appellant was compelled to pay up the
whole balance due from *Trueman* to the appellee, then
*Trueman* became answerable to the appellant for the
same sum which in the other case he must have been
liable for to the appellee; to him therefore it made no dif-
ference.

As to the statute of frauds which requires a written
contract for the sale of lands, it has not been pleaded or
relied on; nor is it a case to which the statute would ap-
ply. The contract by which the appellee is obliged to
convey the land, the sum for which it is to be conveyed,
and the person to whom he is to convey, are all estab-
lished by documents in writing. The only question in
dispute is with regard to the manner in which he agreed
to receive the payment of a small part of the purchase
money, and the person from whom he agreed that he
would receive it.

Suppose I owed 500*l* for the purchase money of lands to be conveyed to me, and I deliver accounts due to me from other persons to my creditor, which he agrees to receive and collect in discharge of that sum, this need not be reduced to writing under the statute of frauds; and if without my default he should not be able to collect the debts which he had agreed to receive as payment, it must be his loss.

It is indisputably established by the proof that the appellee did know of the sale made by *Trueman* to the appellant; that he did afterwards agree to hold *Trueman* personally and only answerable for what *Trueman* owed for the land, more than the balance due from the appellant to *Trueman*, on the appellant's agreeing to pay to him the appellee, that balance; and that in consequence the appellant gave up to *Trueman* the bond he had received for the conveyance, and took in lieu thereof an assignment of the bond given by the appellee; by this means relying on the engagement of the appellee, the appellant deprived himself of any remedy against *Trueman*. He might have brought suit upon the bond, had it not been given up, against *Trueman*, while solvent, and thereby forced him to have paid up the purchase money to the appellee. The appellee *ought* to have compelled *Trueman* to have paid up the purchase money while he was able to have paid. He had it in his power so to have done, having *Trueman's* bonds for the money. This he neglected; indulged *Trueman* until he became insolvent, and now, contrary to his engagement, and in violation of it, wishes to cause that loss, which has been entirely owing to himself, to fall upon the appellant, who was by his promises deprived of the means of preventing it.

The Court of Appeals, [*Rumsey*, Ch. J. *Mackall* and *Jones*, J.] at this term, (June term 1799,) *affirmed* the decree of the court of chancery.

## COURT OF APPEALS, JUNE TERM, 1799.

### Whetcroft vs. Christie.

Appeal from a decree of the court of chancery, dismissing the bill of complaint. The bill states, that the complainant purchased of the defendant at Baltimore, in May 1775, *thirty-one* servants, at 9*l*. 10*s*. 0*d*. sterling each, one half to be paid in hand, and the other half in six months, on giving security. That the complainant did